1

1          UNITED STATES DISTRICT COURT
2          EASTERN DISTRICT OF NEW YORK

3     - - - - - - - - - - - - - - X

4     GUZZO,                          :    CV-99-06612
                                            (SJ)
5                    Plaintiff, :

6        - against -               :    United States Courthouse
                                        Brooklyn, New York
7     UNITED STATES OF AMERICA,    :
                                        February 2, 2001
8                    Defendant. :    9:30 o'clock a.m.
      - - - - - - - - - - - - - - X
9
                    TRANSCRIPT OF PROCEEDINGS
10          BEFORE THE HONORABLE STERLING JOHNSON, JR.
            UNITED STATES DISTRICT JUDGE
11
      APPEARANCES:
12
      For the Plaintiff:          EDWARD WILFORD, ESQ.
13                                MARCIA G. SHEIN, ESQ.

14
      For the Defendant:          LORETTA E. LYNCH
15                                United States Attorney
                                  One Pierrepont Plaza
16                                Brooklyn, New York 11201
                                  BY:   JAMES WALDEN
17                                Assistant United States Attorney

18

19

20

21

22

23
      Official Court Reporter:        Diana Pereira, RPR, CSR, CRR
24    (718) 260-2600 (x 6621)         225 Cadman Plaza East
                                      Brooklyn, New York  11201
25          Proceedings recorded by mechanical stenography.
                    Transcript produced by CAT.

D. Pereira, CRR

2

1          THE CLERK:   United States of America vs. Guzzo.

2          THE COURT:   Good morning.

3          MR. WALDEN:   Judge, we didn't produce Mr. Guzzo.   We

4    did not produce him.   It is our position -- and I don't want

5    to steal the thunder from counsel -- but it is our position

6    that this petition, unlike any merits of Mr. Lindemann, is

7    wholly frivolous.

8          Mr. Guzzo is in a maximum security facility in

9    Marion, Illinois, and we believe that there is always a danger

10   with an inmate that is at Mr. Guzzo's level, in transporting

11   him and bringing him back to this district.   Because this is a

12   2255 and he has no right to appear, we did not produce him.

13         MR. WILFORD:   We don't have any objection.

14         First of all, Edward Wilford and Marcia Shein for

15   Mr. Guzzo.

16         We don't have an objection to Mr. Guzzo not being

17   present for purposes of arguing.   We strongly differ with the

18   government with respect to the characterization of Mr. Guzzo's

19   petition as frivolous.

20         MR. WALDEN:   I apologize.   I didn't mean to steal any

21   thunder here.

22         THE COURT:   He has submitted papers; is that

23   correct?

24         MR. WALDEN:   Yes, Judge, and as have I, about six

25   months ago.

D. Pereira, CRR

1      MR. WILFORD:  I'm sorry to say I neglected to bring

2  my file.

3      One second, your Honor.  I believe we can provide the

4  Court with that.

5      THE COURT:  I understand you've addressed the issue

6  of the waiver but not the ineffective assistance of counsel in

7  your papers.

8      MR. WALDEN:  I haven't gone to the merits, Judge.  I

9  will explain why, because I would rather have counsel speak

10 first because I don't want to be excused of stealing their

11 thunder.

12     There is a reason for that.  I will explain.

13     MR. WILFORD:  We are still trying to locate the

14 letter, your Honor.

15     MR. WALDEN:  This is my fault, Judge.  I should have

16 brought an extra copy of papers for the court.  They are

17 looking for my February 14th letter.

18     MR. WALDEN:  It was only two-and-a-half pages.

19     I can certainly explain my argument after counsel has

20 the opportunity to present their strongest argument in favor

21 of the petition.

22     THE COURT:  Go ahead.

23     MR. WILFORD:  Your Honor, the bottom line, and I want

24 to try to frame the issue and Ms. Shein will join in with the

25 Court's permission.

4

1        Basically, we present the Court with the fact that

2   Mr. Guzzo is represented by a conflict of counsel, which in

3   effect--

4        THE COURT:  Conflict of counsel?

5        MR. WILFORD:  Yes.

6        THE COURT:  Who was his counsel.

7        MR. WILFORD:  Mr. Ronald Rubenstein.

8        Although there was an earlier waiver of the conflict

9   in the case, that dealt with a separate issue, your Honor.  It

10  did not deal with the death penalty issue.

11       We would present to the court that the fact that

12  Mr. Rubenstein was conflicted and represented Mr. Guzzo at the

13  time of the death penalty, a determination on the death

14  penalty was being sought, that Mr. Guzzo could not waive that

15  conflict with respect to the death penalty issue because the

16  death penalty, as the Supreme Court of the United States has

17  stated, death is different.

18       It would appear, your Honor, that Mr. Guzzo was never

19  directly addressed on that issue, from the transcripts that

20  we've provided to the court.  He was never specifically asked

21  with respect to the context of the death penalty issue whether

22  or not he wanted to or even was seeking a waiver.  We maintain

23  it is a non-waivable conflict of counsel.

24       Beyond that, your Honor, the fact that Mr. Guzzo was

25  indeed represented by conflicting counsel did indeed rise to

D. Pereira, CRR

5

1  an ineffective assistance of counsel at a critical point in

2  the case.  Mr. Guzzo was severely prejudiced by the

3  ineffective assistance of counsel that he received from

4  Mr. Rubenstein, which resulted in a plea to avoid the death

5  penalty and a current sentence of 38 years.

6          Mr. Guzzo was in a situation, your Honor, where,

7  according to the transcripts, Mr. Walden was seeking an

8  adjournment prior to pursuing the death penalty.  He requested

9  an adjournment of Mr. Rubenstein.  Mr. Rubenstein was

10  intransigent in his refusal to concede to the government's

11  request for an adjournment notwithstanding the fact that the

12  government indicated on the record in open court that the

13  failure to agree to the adjournment would result in the

14  government seeking the death penalty.  For whatever reason,

15  Mr. Rubenstein did not agree to the adjournment, and it did,

16  in fact, result in the severe prejudice to Mr. Guzzo.

17          Your Honor, at this point we want to be clear with

18  the court that Mr. Guzzo is not seeking to have his plea

19  overturned.  He is not asking to have his plea given back.  He

20  is asking to have a sentenced adjusted to reflect the

21  appropriate sentence that he would have received had he not

22  been represented by conflicted and ineffective counsel.

23  Mr. Guzzo sentenced in a manner that did not afford him the

24  treatment that the guidelines were intended to provide all

25  defendants.  Mr. Guzzo's plea resulted in an offense level of

6

1  54.

2          THE COURT:  He got 38 years for, how many murders?

3          MR. WILFORD:  They were multiple murders.

4          THE COURT:  And he thinks that that's not-- he was

5  expected to get the death penalty?

6          MR. WILFORD:  That's also correct, your Honor.

7  However, I do believe that in the context of the case, had he

8  not been represented by ineffective counsel, there were plea

9  offers on the table which were significantly lower than 38

10  years.

11          THE COURT:  There are two things I hear you saying:

12  Number one, there was a conflict;  and number two, there was

13  ineffective assistance of counsel.

14          MR. WILFORD:  I think the two go hand in hand, your

15  Honor.  I think being represented by conflicted counsel indeed

16  rendered the assistance of counsel that Mr. Guzzo received

17  ineffective.

18          THE COURT:  Let me hear the government.

19          MR. WALDEN:  Judge, there's a couple of issues here.

20  First of all, Mr. Wilford was talking about conflicted

21  counsel, conflicted counsel.  I've yet to hear any

22  identification of what the alleged conflict was.

23          Their claims essentially break down in two parts,

24  Judge.  First, that counsel was ineffective for failing to

25  take a plea offer that they claim was initiated by the

D. Pereira, CRR

7

1    government.  Secondly, that counsel was ineffective for -- I

2    am doing a little bit of constructing of their own argument

3    because it really was not clear to me -- counsel was

4    ineffective for taking advantage of the fact that in their

5    view the government had acted in a retaliatory way by seeking

6    the death penalty in retaliation for his not granting an

7    adjournment of the case.

8            I will take the issues separately, Judge.  I want to

9    say this one directly.  There was no plea offer.  Period.  You

10   look at their affidavits, Judge.  You look at what

11   Mr. Solotoff and Mr. Rubenstein said.  They both indicate

12   there was some level of negotiations.  They are sophisticated

13   defense counsel.  They know that any plea offer made by the

14   government is made in writing with approval of a supervisor.

15   They cannot point to any specific promise orally, let alone a

16   written document, that was ever offered by the government

17   prior to the final disposition that Mr. Guzzo got.

18           They've indicated, Judge, that somehow the

19   atmospherics of the case and the government's seeking the

20   death penalty was in some way retaliatory and that the

21   government pulled off this alleged plea offer.  Judge, what

22   happened is simply this.  Mr. Guzzo had not one lawyer, but

23   two.  He was represented first by Mr. Rubenstein, and then,

24   when the death penalty count was added to the indictment,

25   Mr. Solataroff was appointed.

D. Pereira, CRR

8

1        Then, after some point Gavin Scottie was also

2   retained by Mr. Guzzo, with Mr. Guzzo's expressed hope of

3   trying to reach a disposition in the case.  Mr. Scottie didn't

4   simply meet with me, Judge, he didn't simply meet with my

5   supervisor.  Mr. Scottie met with the United States Attorney,

6   Zach Carter, and went through all of the details of what had

7   lead to that point in the case, discussed the seriousness of

8   Mr. Guzzo's charges.

9        THE COURT:  Was there a point in time in which

10  Mr. Rubenstein was relieved and Mr. Scottie came in?

11       MR. WALDEN:  I don't remember the exact point at

12  which this occurred, Judge, but there certainly was a point at

13  which Mr. Rubenstein was relieved.  I am not positive it was

14  the exact same moment that Mr. Scottie came on.

15       There may have been three attorneys on his case for a

16  period of time, although, I believe if there was such a time,

17  it was a short time.

18       THE COURT:  Now, when Mr. Guzzo took his plea, who

19  was his lawyer?

20       MR. WALDEN:  Mr. Scottie and Mr. Solataroff.

21       MR. WILFORD:  Your Honor--

22       THE COURT:  Hold on.  Let me hear the government's

23  presentation.

24       MR. WALDEN:  Judge, the bottom line is that in terms

25  of this retaliation argument, what counsel simply fails to

D. Pereira, CRR

1   bring to the Court's attention is that there were significant

2   developments in the case that lead the government to seek the

3   charge for the Borelli murder, and some of the codefendants in

4   the case began cooperating with the government.

5          The government seized some significant evidence and

6   secured that cooperation from accomplices.  That lead it to,

7   at the point in time where it sought the charges, to seek the

8   charges, and the charges were sought in good faith.

9          At some point, we notified the Court, as is our

10  obligation, that we felt that we were reaching a fulcrum where

11  there was sufficient evidence to seek additional charges for

12  the Borelli homicide and that in fact the Borelli homicide was

13  a death-eligible count simply because of the date on which the

14  murder occurred.

15         But the government never sought the death penalty,

16  never said it was going to seek the death penalty, never

17  threatened to seek the death penalty.  All we said is, Judge,

18  is that it is a death eligible count.

19         In point of fact, Mr. Guzzo pled guilty before the

20  Attorney General ever reached any decision one way or another

21  about whether or not to seek the death penalty.

22         The fact that the government indicted a murder that

23  happened to be  death eligible has no bearing whatsoever on

24  anything except potentially the defendant's own mind-set,

25  which is, obviously, something we can't control.

1   The simple fact is there was one plea agreement

2   negotiated and approved by the United States Attorney's Office

3   and it was a plea agreement that both provided the defendant

4   significant benefits, regardless of whether or not he was

5   charged with the death penalty because his crimes carried a

6   mandatory life sentence, and the government and the court

7   sentenced him to the exact same agreement that he accepted.

8   In this very courtroom, the defendant was placed

9   under oath and asked whether or not there were any threats or

10  coercion that caused him to accept that agreement.  Under

11  oath, he indicated that there was none, that he was pleading

12  guilty because he and his lawyer both agreed that there was no

13  viable defense to the very, very serious charges that he

14  faced.

15  Now, to try and get around the waiver, counsel -- and

16  I respect counsel; that counsel has a job to do and that they

17  are doing it -- but, Judge, this claim that there was

18  ineffective assistance is simply frivolous.

19  THE COURT:  Let me ask you.  When he took this plea,

20  his lawyer was Gavin Scottie.  How does Mr. Rubenstein play

21  into this situation?

22  MR. SHEIN:  If I may.  I have a little more of the

23  sequential facts; I think it would be helpful for the court,

24  if I may.

25  When Mr. Rubenstein was representing Mr. Guzzo, he

D. Pereira, CRR

1  was representing him in a number of ways throughout the

2  pretrial -- and they had multiple, multiple pretrial hearings

3  before this court.  In the process of that, there was a big

4  argument with the government and the court about whether or

5  not a postponement on the trial date that Mr. Rubenstein

6  wanted to initiate of May 11th should be postponed and, if it

7  was postponed, what the consequences of that would be.

8  There's transcripts, and they have been submitted to the Court

9  in our pleadings, that specifically reflect upon the series of

10 events.  There's three specific transcripts that have the most

11 weight.

12          THE COURT:  I understand that.  As I understand it,

13 Mr. Scottie was the lawyer for Mr. Guzzo when he took his

14 plea.

15          MR. SHEIN:   In the end, yes.  What happened, along

16 the way resulted in this case escalating from conversations

17 and plea considerations of 25 years and 30 years all the way

18 up to 38 years.  The record actually does reflect upon the

19 threats by the government as to:  If you don't agree to this

20 adjournment, we are going to supersede and we are going to do

21 this and we are going to do that.

22          Mr. Guzzo never even sat and was able to discuss this

23 with his lawyer in open court whether we would waive any issue

24 of the postponement or waive Mr. Rubenstein's representations

25 over the problem that was created that's in the record.

D. Pereira, CRR

1    Mr. Solataroff appeared before this court and was concerned

2    about this conflict.  The court would not conflict him out but

3    at the same time it was brought up how this situation

4    developed.  Mr. Guzzo, himself, was never asked is this going

5    to be acceptable to proceed despite this conflict.

6            THE COURT:   What about the government's claim when

7    the Court asked have there been any threats or promises made

8    to induce you to accept this plea?

9            MR. SHEIN:   I believe Mr. Guzzo at the time that

10   that occurred was not aware of the sequence of events that

11   affect that process or his due process rights not to be

12   threatened with the death penalty when he was coerced into

13   this.  It comes across very clearly.  The lawyers have

14   admitted to this type of conduct being a problem in the case

15   and that they believed it caused the death penalty threat to

16   be held over Mr. Guzzo.  I don't think he understood the law

17   or the facts and how that would affect him.

18           MR. WILFORD:   Your Honor, most respectfully on that

19   point, the court is asking a defendant, not a sophisticated

20   defendant, but a defendant in a matter whether you've been

21   threatened or not and that threat, most of the time for most

22   people, is taken as some sort of physical threat.  The threat

23   that occurred was the overall threat of being prosecuted.

24           THE COURT:   You are saying that Mr. Guzzo, who is

25   charged with murder, is unsophisticated?

D. Pereira, CRR

13

1          MR. WILFORD:  In legal matters, yes.

2          THE COURT:  Does Mr. Guzzo have a criminal

3   background?  Criminal category 2, wasn't he, or 3?

4          MR. WALDEN:  Judge, I don't want to answer that

5   question when I am not a hundred percent sure.  As I stand

6   here right now, it has been quite a while since I reviewed

7   that, Judge.  Needless to say --

8          THE COURT:  Is your position in your papers?

9          MR. WALDEN:  My position is in my papers, Judge,

10  concerning everything but the merits, Judge.  The most

11  important part of my papers, at least in my view, was the

12  fact, obviously, that there was a plea allocution, Judge, and

13  he was placed under oath.  Your Honor was very careful in this

14  case to make sure that Mr. Guzzo understood the appellate

15  waiver and Mr. Guzzo had been represented in court every

16  single time, Judge.

17         You are obviously right that he knows what a threat

18  was and he didn't feel threatened, Judge.  He knew, at best,

19  he faced a long, long term in prison, probably the rest of his

20  life, and counsel was effective in securing a plea agreement

21  that gave him specific articulable benefits, Judge, which is

22  the difference between a life sentence and a thirty-eight-year

23  sentence.

24         Counsel's attempt to frame this as an ineffective

25  assistance of counsel claims, in spite of counsel's diligence

D. Pereira, CRR

1  in this case, to me, Judge, just shows that it is frivolous

2  and it should be dismissed.

3        MR. WILFORD:   Your Honor, we have two other issues I

4  would like to bring to the court's attention.   One, I would

5  like to respond to Mr. Wilford's last argument, but Ms. Shein

6  has an issue I would like to place before the court.

7        Go ahead.

8        MS. SHEIN:   The problem goes beyond this.   It is not

9  that simple as Mr. Walden would like to suggest.   There are

10 actual transcripts submitted to the court and affidavits that

11 prove our position has gone unrebutted along with other

12 questions of the conflict, whether Mr. Guzzo understood what

13 was going on, whether he was asked to waive the conflict.

14       THE COURT:   Just a second.   You got a court reporter

15 here.

16       MR. SHEIN:   But there is another issue, and that is,

17 that even under the federal Sentencing Guidelines, he was

18 categorized incorrectly.   He was categorized at level 54.

19 There is no such level.   He received acceptance of

20 responsibility credit, which he would never have benefited

21 from under some merging law that was available.   Then the 43

22 is the cap under chapter 5 and any benefit must come from

23 that.   If you do that calculation, his guidelines would have

24 been in the 25-to-30-year range.   He was sentenced outside the

25 guidelines in respect to how the presentence report ended up

D. Pereira, CRR

1  evaluating the case.

2          Even that may reinforce the problem that Mr. Walden,

3  at the time when they were discussing these plea negotiations,

4  whether it was in writing or not, was within the range that

5  was available.  There are bigger issues than certainly what

6  Mr. Walden suggests is frivolous.

7          They are in the pleadings.

8          MR. WALDEN:  That is my point.  Her argument

9  completely misses the point.  He was charged under

10 1959(A)(1).  That is mandatory life.  It doesn't matter what

11 the guidelines were.  If he was convicted of the Borelli

12 homicide, your Honor would have had no discretion but to give

13 him a life sentence.  Counsel, faced with that significant

14 possibility, secured for him a plea that gave him the

15 possibility of being released from prison after approximately

16 32 or 33 years.  So to phrase that now in retrospect as

17 ineffective and then --

18         THE COURT:  Let me hear you, counsel.

19         MR. WILFORD:  Your Honor, I want to just respond to a

20 couple of comments that Mr. Walden made.  He has alluded to it

21 again in his most recent comments.

22         The death penalty, your Honor, is not something that

23 we can just talk about.  It is a very serious, serious,

24 serious consideration.  You can't say that when a defendant is

25 facing a count that's death eligible he is just facing a

D. Pereira, CRR

1    count.  It is a distinct difference in the case.  It presents

2    a distinct issue in the case.  The defendant is then entitled

3    to different learned counsel.  There are a whole sequence of

4    events that --

5            THE COURT:  Learned counsel was appointed.

6            MR. WILFORD:  I am saying, there are a whole

7    different sequence of events that occur.  And the thrust of

8    Mr. Walden's argument is that, well, you know we never really

9    threatened him with the death penalty; it was just out there.

10   That fact, your Honor, belies what actually happened.

11           In this instance, your Honor, the effective

12   assistance of counsel that Mr. Walden's alluding to that

13   occurred at a later date does not obviate the ineffective

14   assistance Mr. Guzzo received which placed him in a position

15   at a time when he was in fact facing a death-eligible count

16   that he did receive effective counsel.  It doesn't change what

17   happened before.  I think when Mr. Walden talked about

18   Mr. Guzzo's attorney negotiating effectively, indeed he may

19   have, given the circumstances in which he found himself in.

20           But to have been placed in those circumstances by

21   ineffective representation, your Honor, needs 404(b) to be

22   addressed.  I want to just stress to the Court we are not

23   asking the Court, as I started to say before, we are not

24   asking the court to withdraw Mr. Guzzo's plea.  We are asking

25   the Court to do what Mr. Shein indicated, to treat

D. Pereira, CRR

1  Mr. Guzzo --

2         THE COURT:  That undercuts your argument.  You are

3  saying counsel was ineffective but you still want to take the

4  plea but you want a lesser sentence.

5         MR. WALDEN:   He was saying there is a remedy to the

6  court, there is a remedy the court he can apply that would

7  satisfy this ineffective assistance of counsel without going

8  all the way to the level of giving him his plea back.   There

9  is an effective remedy.

10        MR. WILFORD:   The remedy that we are proposing to the

11 Court is simply that the Court look at what Ms. Shein has

12 indicated, that at a level 43, which is the maximum, and Mr.

13 Walden alluded that he would be facing a life sentence, that's

14 not the plea.

15        The plea was to a situation where he is facing a

16 guideline level of 54.  If you bring it to 43, give him three

17 points for acceptance of responsibility, it comes down to

18 level 40.  At level 40, you are talking about, I believe in

19 the range of 25 to 38 years.  That's what we are talking about

20 here.  We are not saying give Mr. Guzzo his plea back, we want

21 to go to trial.  What we are asking the court to do is --

22        THE COURT:  I am going to decide this on the merits.

23        That's it.

24        I think you should take into consideration, I heard

25 the government say that in some cases, one day, when arguments

1   like this come before the court, they are going to agree to

2   let the defendant withdraw his plea and he is now going to be

3   exposed to the ultimate.

4           Is that what you want?

5           MR. WILFORD:  Your Honor, that's why I proposed a

6   remedy to the court which did not involve a withdrawal of

7   Mr. Guzzo's plea.

8           MR. WALDEN:  There is one thing that I have to say

9   for the record, and if the Department of Justice gets a copy

10  of this transcript -- and I am saying something that I am not

11  supposed to be authorized to say; I am unaware of it so I am

12  I'm sorry.  But there is one thing that counsel knows as they

13  are standing here, and the fact that they are not saying it,

14  Judge, I believe is extremely significant.

15          I believe that when Mr. Gavin and Mr. Solataroff met

16  with the United States Attorney, the United States Attorney

17  made it clear what his position was on the death penalty, what

18  the recommendation was going to be on the death penalty.  It

19  is -- let me say it is not consistent with the argument that

20  they are making, that as Mr. Guzzo was standing here in front

21  of the Court he believed that the government was gunning for

22  him and was going to seek the death penalty.

23          Judge, I want to make sure that I go back and speak

24  to my supervisors before.  If this came to a hearing, it would

25  obviously have to be a full hearing.  Mr. Scottie would have

1    to be here.  He would have to talk about the conversation he

2    had with the United States Attorney.  Obviously, there's very

3    significant consequences.  Judge, there is a procedure here,

4    and the procedure belies the argument that the court has the

5    authority that they claim the court has.  This is a 2255

6    petition.  They are asking you to vacate his sentence.  If

7    your Honor grants that petition --

8                THE COURT:  That's what I said.

9                MR. WALDEN:  I'm sorry, if I am saying it, Judge, I

10   want it to be clear to counsel.  We are now at the stage of

11   prior to sentencing and both parties have the right to

12   withdraw the plea.  I am not saying at all that the government

13   would do or not do anything, Judge.  It is irrelevant what

14   penalty he would seek.

15           But your Honor is right, that all of this is just

16   simply an end run and there was a fair plea that the defendant

17   entered into knowingly, and this is just an attempt to get a

18   lower sentence.  That's all this is, Judge.

19               MR. WILFORD:  Just one point.

20               THE COURT:  That's what counsel said.  They didn't

21   want to withdraw the plea; they just want a lower sentence.

22           Just a second.  Are there any more submissions that

23   you would like to add to what you've already added?

24               MR. WALDEN:  Not at this time, Judge.  If the court

25   has additional concerns about any other issues or more issues

D. Pereira, CRR

1   are raised, we are happy to brief whatever the court would

2   like us to.  Those papers essentially layout what I've just

3   said, Judge.

4           THE COURT: Do you want anymore submissions?

5           MR. WILFORD:  Your Honor, yes.  Can we have two weeks

6   to put something in?

7           THE COURT:  What are you going to put together?

8           MR. SHEIN:   Let me ask before you continue that

9   thought.

10          We have submitted the original petition, a plea

11  petition, supplemental documents, including affidavits, plus

12  the transcripts that are applicable.  We have supplied to the

13  court actually the summary of all that in the last submission

14  that I thought the court would have available to it this

15  morning.  I want to make sure you do have that because it

16  reflects specifically these transcripts we want the court to

17  review talking specifically to Mr. Walden's statements

18  concerning if this adjournment was not agreed to that it would

19  be pursued in a superseder.  In fact, it is repeated in those

20  three transcripts.

21          MR. WALDEN:  Do you want to give me the dates and the

22  pages?

23          MR. SHEIN:   February 4th is the first one, of '98.

24  This is not page specific.  Initial conversation about the

25  postponement.  The actual one that is of consequence to you is

1  February 18, page 7.  And then there is another one subsequent

2  to that, which is July 2, and that would be Mr. Rubenstein's

3  commentary on the same issue on page 6.  This is the conflict

4  transcript where Mr. Rubenstein specifically brings up the

5  concerns he has and no one ever speaks to Mr. Guzzo about

6  that.

7          MR. WILFORD:  Your Honor, the only reason I was

8  requesting two weeks, I wanted to have an opportunity to look

9  at the transcript from today's proceedings.

10          THE COURT: We'll get an adjourned date.  If you want

11  to submit something thereafter, you just let me know.  I heard

12  you loud and clear.  You got a 2255 for the purpose of getting

13  a lower sentence.  Okay.

14          MR. SHEIN:  Guideline sentence, Judge.  It should

15  have been a guideline sentence in the beginning.

16          MR. WILFORD:  Appropriate sentence.

17          One final point.  Mr. Walden's statement I don't

18  think he was talking out of school.  I understand he is a very

19  passionate prosecutor and he was indicating that the position

20  of this particular United States Attorney may not have been to

21  seek the death penalty and that it may have been conveyed to

22  Mr. Scottie.  I don't know that for a fact.

23          But I do know, however, your Honor that in several

24  instances in this district and in the Southern District,

25  notwithstanding the recommendation and the position of the

D. Pereira, CRR

22

1  United States Attorneys in those two districts, that

2  Washington has in fact decided --

3          THE COURT:  I understand the protocol.  It goes to a

4  committee in the Eastern District, then to the United States

5  Attorney, then a committee in Washington, in which death

6  penalty counsel have a right to put their position forth in

7  Washington, and then ultimately to the Attorney General.

8          MR. WILFORD:  Whose decision can be --

9          THE COURT:  The ultimate decision is the Attorney

10 General's.  If everybody else says no, the A.G. can say yes.

11         But, also, I heard Mr. Walden say that in the

12 protocol in which there is a committee in the Eastern District

13 in which the death penalty counsel does not have the right to

14 present his case to the United States Attorney, in this

15 instance the United States Attorney saw Mr. Scottie, who

16 represented Mr. Guzzo.

17         MR. WILFORD:  That is correct, your Honor.

18         MR. WALDEN:  And Mr. Solataroff, Judge.

19         THE COURT: And Mr. Scottie.

20         MR. SHEIN: All of that after the fact of what

21 happened.  That's what we are leading up to.

22         MR. WALDEN:  No, Judge, that was not after the fact.

23 That was before the final plea number was negotiated.  That

24 meeting was for the purpose of addressing not only the death

25 penalty concerns, but I mean specifically negotiating a plea.

D. Pereira, CRR

1  The negotiations occurred between Mr. Scottie and Mr.

2  Solataroff with the United States Attorney, with me present,

3  and it was as a result of a series of conversations that the

4  38 number was arrived.

5          MR. SHEIN:    I am not disagreeing with that.  I don't

6  know want to mislead.  I am telling the court there's a series

7  of events that occurred before they got his case.

8          THE COURT:  Slow down.  You have no case at all

9  without a record.

10          MR. SHEIN:    The series of events that lead up to

11  what Mr. Walden is referring to is indeed those things -- he

12  is not misleading the court.

13          I am just saying there was a series of things before

14  Mr. Scottie and Mr. Solataroff got the case that created a

15  scenario for Mr. Scottie and Mr. Solataroff to be limited in

16  what they could do at that point.  Indeed, that is what caused

17  Mr. Guzzo the problem.

18          I also would like to add, just for the court's

19  concern, that Mr. Guzzo, yes, he was facing life, but once

20  there was a plea negotiation on the table, that was no longer

21  true, and that then results in a guideline sentencing problem

22  that has to be done straight up by the guidelines.  If they

23  are not, then they are getting outside the guidelines, trying

24  to go for a heartland decision above them, and there would be

25  departure issues.  There has to be a question here that must

1  be addressed concerning that.

2          THE COURT:  He was exposed to a mandatory life

3  count.  What's above that?

4          MS. SHEIN:  When they drop out or getaway from a

5  mandatory portion, the guidelines take effect.

6          MR. WALDEN:  Can I just ask the court to clarify one

7  thing with counsel so there is no misunderstanding about this

8  on the record, because they said I was accurate about

9  everything but not this specifically, and I think this is

10  important for the court to ask them directly.

11          At the time Mr. Guzzo took the plea, did his counsel

12  communicate to him that it was their understanding that the

13  United States Attorney in this district was going to recommend

14  against the death penalty?

15          MR. WILFORD:  I'm sorry, Mr. Walden.  Could you

16  just --

17          MR. WALDEN:  I am asking the court to ask you a

18  question.  I am not addressing you directly.

19          THE COURT:  Yes.  Did you hear the question?

20          MR. WILFORD:  I didn't hear the question but I heard

21  the question.  I would most respectfully say to the court

22  that's a matter that I am not in a position to testify.  I was

23  not at that meeting.  That's not contained in any affidavit we

24  obtained from Mr. Guzzo.  If that is something that the court

25  wishes to explore, the problem with --

D. Pereira, CRR

1          THE COURT:  I wish to explore that.  Find out from

2    your client.

3          MR. WALDEN:  Judge, they filed these papers claiming

4    that the defendant was under the threat.  They used this word

5    in their papers.

6          Are they saying that they've never asked their client

7    whether or not counsel communicated to them that it was

8    counsel's belief that the United States Attorney was not going

9    to recommend for the death penalty?

10          THE COURT:  Is that your position?

11          MR. WILFORD:  No.  Your Honor, I am not taking a

12    position on that question.

13          As I started to say to the court, the conversation

14    that occurred, I was not privy to.  There has been no

15    affidavit from Mr. Scottie indicating anything about that

16    conversation.

17          THE COURT:  What about your client?

18          MR. WILFORD:  I haven't discussed it with my client

19    in terms of whether or not there was any representation by

20    Mr. Scottie as to the United States Attorney's position.

21          THE COURT:  I spent enough time on this.

22          Let's get an adjournment.  A month.  You are going to

23    submit additional papers.

24          MR. WILFORD:  I may submit additional papers.  As I

25    said, I wanted to look at the transcript to make sure there is

D. Pereira, CRR

1  nothing we touched on today that hasn't been addressed by

2  submissions.

3          THE COURT:  I am going to give you two weeks to

4  submit papers.

5          If you have something further to submit, we'll

6  adjourn it a month thereafter.

7          THE CLERK:  March 16.

8          THE COURT:  If they submit papers, do you want --

9          MR. WALDEN:  Here is my problem.  I am starting a

10 complex trial in front of Judge Korman on the 26th.  I don't

11 want to adjourn this.  I want this dealt with as quickly as I

12 can possibly do, given my other responsibilities, Judge.

13         May I receive counsel's papers, read them as quickly

14 as possible, and then notify the court in writing if I wish to

15 submit something else and request a particular date.

16         THE COURT:  Okay.

17         MR. WILFORD:  That's fine.

18         Considering Mr. Walden's schedule, I am very busy

19 myself, involved in the embassy bombing trial.  I understand

20 it there are time considerations.  If there is nothing to

21 write or submit additional papers on, I will notify the court

22 and Mr. Walden by a letter by the middle of next week.

23         THE COURT:  Okay.

24         MR. SHEIN:  Very good.

25         MR. WALDEN:  We can write the court and suggest a

D. Pereira, CRR

27

1  couple of days and your Honor can tell us what date you would

2  like us to come back.

3          THE COURT:  Let's give a date now.

4          THE CLERK:  The papers February 16th, two weeks, and

5  March 16th for the next conference.

6          MR. WILFORD: Thank you for your time and

7  consideration.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D.  Pereira,  CRR