# LINDA S. SHEFFIELD
### ATTORNEY AT LAW

*400 Embassy Row, Suite 470*
*Atlanta, Georgia 30328*

TELEPHONE (770) 671-1234
FACSIMILE (770) 399-6789

DIRECT E-MAIL: linda@sheffieldlawfirm.com
STAFF E-MAIL: lindasheffield@earthlink.net

July 30, 2008

The Honorable Sterling Johnson, Jr.
United States District Judge
225 Cadman Plaza East
Brooklyn, NY 11201

RE:    *Vito Guzzo v. United States*
Civil Docket No. No.  99 Civ. 6612-SJ
Transcript page accidentally left off 7/8/08 filing,
Document Number 67
Request for Additional Documents

Dear Judge Johnson:

When the affidavit of Mike Marciano was filed on July 8, 2008, page 5 of the evidentiary hearing was accidentally left out of that submission.  It is enclosed with this filing, together with another copy of the Marciano affidavit, for purposes of continuity.

The importance of page 5 of the evidentiary hearing is the discussion of the tapes government informant/witness Mike Durso made of two attorneys, Guzzo's lawyer, Ron Rubinstein being one of them.  At the June 3, 2002 hearing, Mr. Wilford asked for the tape, and the Court asked for something more than speculation before an ordering the government to turn over the tape.

Request for Additional documents: A tape was provided to Mr. Wilford, however it was indecipherable, and the government did not provide the 302's or 209's or any written documentation of a discussion between Durso and agents of the recorded conversation with Guzzo's lawyer, which is now requested.  Also requested is a clear copy of the tape between Durso and Ron Rubinstein.

The affidavit of Mike Marciano is critical to this contention, since the Marciano affidavit supports Guzzo's claim that the government did invade his defense, by taping his attorney during discussions of Guzzo's case and by influencing the selection of new counsel and actually quoting the fee he should pay to the attorney, who was pressed upon him by another government informant, Francesca Bartolotta.

Also attached to this submission is the 23 page time line, setting out the events which led to Guzzo's guilty plea.  This was previously filed with this Court on August 1, 2004, in conjunction with a letter and larger submission from Edward Wilford, co-counsel in this case.  It is included for

The Honorable Sterling Johnson
July 31, 2008
Page 2

the Court's convenience in reviewing this portion of Guzzo's claim.

The Court's consideration of this information is respectfully requested.

Respectfully submitted,

S/Linda S. Sheffield

Linda S. Sheffield

**Certificate of Service**
All counsel was served by electronic filing through the ECF system in the Eastern District of New York, this 31st day of July, 2008.

S/ Linda S. Sheffield

# 4/23/08 AFFIDAVIT OF MIKE MARCIANO

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------X

VITO GUZZO

-AGAINST-                                                AFFIDAVIT
                                                         99-CV-6612 (SJ)

UNITED STATES OF AMERICA
                              Defendant
----------------------------------------------------X

Queens County, New York:

I, Michael Marciano, hereby declare the following to be true under penalty of perjury pursuant to 28 USC Section 1746.

1. I am a friend of Vito Guzzo and have been for many years.

2. I make this declaration freely, without hesitation and without pressure from any person.

3. I recall meeting at a restaurant in Manhattan with Ronald Rubinstein, Esq., Francesca Bartolotta and her husband, Maria Nicci (Vito Guzzo's cousin) and possibly Vito's brother Anthony. The purpose of the meeting was for me to meet with Francesca Bartolotta to speak to her about an idea she had for Vito Guzzo to hire an attorney named Gavin Scotti to have him work out a deal for Vito. Francesca Bartolotta told me Gavin Scotti was friendly with the Assistant United States Attorney who was prosecuting Vito Guzzo's case and Gavin Scotti would be able to work out a deal.

4. Francesca Bartolotta told me at this meeting if Vito Guzzo hired Gavin Scotti, Mr. Scotti would be able to get Vito Guzzo a deal of twenty or twenty-two years.

5. I also met Francesca Bartolotta at her home two or three times during this same period of time, where I also discussed with her the idea of Vito Guzzo retaining Gavin Scotti as his attorney and Scotti being able to get Vito Guzzo a deal for twenty or twenty-two years.

6. I never met Gavin Scotti.

7. At the meeting in the Manhattan restaurant Francesca Bartolotta told me Vito Guzzo, or his family, would have to pay Gavin Scotti $100,000.00. I told Mrs. Bartolotta I would have to get back in touch with her after speaking to Vito Guzzo or his family.

8. I remember sometime shortly after this meeting I gave Francesca Bartolotta $10,000.00 for Gavin Scotti. I believe I gave her this money at her home.

9. At some point in time I went back to Francesca Bartolotta and I got the $10,000.00 back from Francesca Bartolotta because Gavin Scotti was not able to do anything for Vito Guzzo.

10. I have heard of "Cookie Durso" but I don't know him.

11. I never had a meeting with "Cookie Durso" at a strip club named Naked City, or anywhere else, in which we met and discussed Vito Guzzo retaining Gavin Scotti or Francesca Bartolotta's plan to have Vito Guzzo retain Gavin Scotti.

The information contained in this affidavit is a true and accurate recollection of events.

Sworn to me this _____23ʳᵈ_____ day of _____April_____, 2008.

_____
Michael Marciano

_____
Notary

RONALD J. DWYER
Notary Public, State of New York
No. 01DW6035873
Qualified in Suffolk County
Term Expires Jan. 10, 20__

# PAGE 5 JUNE 3, 2002 EVIDENTIARY HEARING

1

| 1 | UNITED STATES DISTRICT COURT |
| | EASTERN DISTRICT OF NEW YORK |

```
2
- - - - - - - - - - - - - - - X
3                             :
   VITO GUZZO,                 :
4                             :    99-CV-06612
                  Petitioner, :
5                             :
         -against-            :
6                             :    United States Courthouse
                              :    Brooklyn, New York
7  UNITED STATES OF AMERICA,   :
8                  Respondent. :
                              :    June 3, 2002
9  - - - - - - - - - - - - - X    11:00 o'clock a.m.

10                         TRANSCRIPT OF CIVIL MOTION
            BEFORE THE HONORABLE STERLING JOHNSON, JR.
11                    UNITED STATES DISTRICT JUDGE

12  APPEARANCES:

13  For the Plaintiff:     EDWARD D. WILFORD, ESQ.
                          MARCIA G. SHEIN, ESQ.
14

15

    For the Defendant:     ALAN VINEGRAD, ESQ.
16                        United States Attorney
                          BY:  JIM WALDEN, ESQ.
17                        Assistant United States Attorney

18

19

20  Court Reporter:        FREDERICK R. GUERINO, C.S.R.
                          225 Cadman Plaza East
21                        Brooklyn, New York
                          718-254-7220
22

23

24

25  Proceedings recorded by mechanical stenography, transcript
    produced by CAT.
```

1          MR. WILFORD:  Your Honor, I believe there's a Messiah

2    violation that occurred.  Here at the government's direction,

3    an informant was sent in.

4          THE COURT:  We are here on the issue of a habeas.

5          MR. WILFORD:  That's correct, Your Honor, and it may

6    impact and does impact.  It is our theory that it does impact

7    on the ability -- when I say plea negotiations, the plea

8    negotiations are two-sided.  The government had a position

9    with respect to plea negotiations, as well as the defense.  If

10   the government has gleaned information from a conversation

11   that they obtained at an informant taping with counsel for the

12   defendant, then that is something that the court should be

13   aware of.  And in terms of whether or not there was a Messiah

14   violation which impacts on Mr. Guzzo, and I think that since

15   we are here on the writ, the court should have all of the

16   information before it and make a decision based on that.

17         THE COURT:  Until you can give me anything other than

18   supposition, or what I call speculation, I will not authorize

19   them to turn it over or order them to turn it over at this

20   particular time.

21         MR. WALDEN:  Judge, I will say at the end of the day

22   I will turn over the tape to Mr. Wilford and Ms. Shein, and if

23   they want to supplement the record with any additional

24   findings, they are free to do so.

25         THE COURT:  That's fine.

# 23 PAGE TIMELINE OF EVENTS SURROUNDING GUZZO'S PLEA OF GUILTY

## TIME LINE OF EVENTS LEADING TO THE 38-YEAR PLEA
## IN VITO GUZZO'S CASE

| | |
|---|---|
| Before 11/96 | In an interview with FBI, U.S. Attorney's office (including Jim Walden, who was present at different times) Fabio Bartolotta was interviewed concerning arranging special visits with organized crime inmates (Anthony Tabbita and the Salvatore Ciccone) through his counselor, Mr. Martinez. According to the report dated 7/20/98 Bartolotta was "presently cooperating with the FBI regarding organized crime matters." Bartolotta also paid to have special visits with Pat Conte. (Exhibit 21) |
| 1997 | Fabio Bartolotta first tried to cooperate in 1997. He testified that he had been caught in several lies and had his agreement ripped up and pleaded guilty to perjury. (Exhibit 19) |
| Early 1997 | Rubinstein is notified of a 25-year plea offer which is rejected. Rubinstein's defense strategy is for Vito to go to trial. |
| 4/25/97 | Fabio Bartolotta's 8/11/98 Cooperation Agreement refers to ". . . any statements made by the defendant to the Office or to other law enforcement agents on or after April 25, 1997. . ." (Exhibit 3) |
| 6/9/97 | During a taped call, Charlie asks Fabio how much Francesca knows as to what Fabio is involved in . . . Fabio replies, not much. Recorder was turned off at this point. (Exhibit 25[6]) |
| 8/13/97 | During a taped call, Fabio and Francesca are discussing lawyer not calling. Francesca waiting for someone to call back. Discussing lawyer not calling. Francesca says that she can't talk to the lawyer because her husband is home. Fabio, "Mom, there are 15 rooms in the house, you can't talk to him?" She says that she'll call him from her cellular phone when she goes out shopping. (Exhibit 26) |
| 9/8/97 | Fabio: What's going on, anything.<br>Francesca: Eh . . .<br>Fabio: Huh?<br>Francesca: No. . . . A lot of things.<br>Fabio: Yeah? |

---

[6]Transcripts made from Fabio's taped telephone conversations at the MDC.

Francesca: I had company this morning again.

Fabio: Again?

Francesca: Yeah.

Fabio: What did they want?

Francesca: What do you think?. . .

Fabio: What did they look at?

Francesca: No, no, we talked.

Fabio: Yeah!

Francesca: We talked.

Fabio: Who came?

Francesca: Bruce came . . .

Fabio: Oh yeah?

Francesca: And the other guy with the little mustache.

Fabio: He's all right that guy.

Francesca: Yeah. And . . . that guy, that guy Mike who was in court last time when we went there.

Fabio: The young guy? . . .

Francesca: So while I was talking, the guy with the little mustache says, "Now I know where Fabio gets it, from you. My God, you too. You talk the same, you move your hands the same . . . You're exactly the same thing." I said, "Well, he's my son."

Fabio: You should have said, "Why don't you stop it?"

Francesca: You had to see me and Bruce. . .

Fabio: Going at it?

Francesca: Huh?

Fabio: Going at it?

Francesca: You gotta see him.

Fabio: He's bad.

Francesca: He goes. . . No, he behaved very well this time. . . .

Francesca: He goes to me, "Francesca, watch." You know we sat down to (UI) coffee. (UI) I told him, "Bruce, what are we gonna do?" I said.

Fabio: What did he say?

Francesca: He said, "What are we gonna do? You tell me." I said, "You. . .Do we have to go on like this? (UI)

Fabio: Yeah?

(Exhibit 27)

9/18/97     Francesca tells Fabio she asked Richie if he spoke to "that guy", Richie will call him tonight. (Exhibit 21)

9/24/97     During a recorded telephone call Fabio asks Francesca what happened over there today. Francesca says the same thing, she was there for a hour and a half and that she has to go back on Friday. She said they were not all there. Fabio

2

asks if Jim was there and Francesca says no.   Fabio said, "So that's why.  Was (UI) there?"  Francesca said, "No".  Fabio asks who was there.

Francesca: Who was there? Just that guy. . . someone new who is in the case.  So I waited and waited . . .

Fabio: Someone new?

Francesca: A guy from . . .

Fabio: FBI?

Francesca: Yeah.

Fabio: Oh!  (Pause) Oh!  So you didn't do anything.

Francesca:  No, I didn't do anything.  That's all.  I cam back.

Fabio: How come no one came again.

Francesca: (UI) Because one guy . . . That guy didn't go at all today.

Fabio: Oh!

Francesca: So. . . . The other guy was in court, he took somebody else place.

Always the same, you know?. . .

Fabio: How is this guy?. . .

Francesca: No, he was in court when. . . we went for the motion, remember? . . .

Fabio: He would like to put things in order or. . .

Francesca: You know, they're trying.  They're really trying to . . . They're

trying

to . . . They're trying from one side and we're trying from one side and we're trying from another side. Eh! We have to see . . . to settle in such a way that it's good for everybody.

Fabio: What time you gotta go on Friday now?. . .

Fabio: You haven't heard from that guy anymore?

Francesca: No.

Fabio: This idiot!

Francesca: No, I haven't called him either, to tell you the truth.  I want to see what happens first, you know.

Fabio: Yeah.  All right, would you like to all over there?

Francesca: All right.  Let me call now.

(Exhibit 28)

10/1/97

Francesca: I called that guy and I have to go tomorrow at 4:00.

Fabio: Yeah?  That guy took himself off the case, right?

Francesca: Who?

Fabio: (UI)

Francesca: I don't know.

Fabio: That's what Vito said.  That's what the lawyer told him.

Francesca: Oh yeah?  I didn't know.  I'll find out tomorrow.  (Pause) That guy Richard didn't call me anymore.

(Exhibit 29)

10/5/97    Francesca and Fabio deny an article that is in the Daily News on page 7.
(Exhibit 30)

10/7/97    Fabio has a telephone call with Francesca and he says that all of the lawyers
were up there this morning, Fabio was called too but his didn't show up. Fabio
asks Francesca to call him and to let him know that the private investigator
came up and to do whatever he has to do to get a hold of him. . .
Francesca: I have to go over there today. (pause)
Fabio: Yeah? What time?
Francesca: (UI)
Fabio: You gotta be there?
Francesca: Yeah.
Fabio: Do you wanna pass by here before you go?
Francesca: No, I won't make it on time now.
Fabio: No. I wanted to call. I didn't think I was gonna come back this late. I
just came up now you know. . .
Francesca says that she needs to spend a half hour alone with her son.
(Exhibit 31)

10/15/97   Fabio calls Francesca. Fabio wants to know what happened. She says she has
to call the deputy-chief tomorrow at ten. They want to send Sal (her husband)
back Upstate based on someone's statement.
Fabio: "Why you don't . . . call that guy, mom?
Francesca: And what do I tell him?
Fabio: You have him call.
Francesca: Not now. No, I can't.
(Exhibit 32)

10/21/97   Fabio: What's going on, nothing?
Francesca: I called that guy over there. . . and, you know, he's gonna call
Charlie   tomorrow and, he said, "Isn't it better if we can all meet, this way if we talk
we'll do it just once instead of going back and forth.". . .
Francesca: I told them that tomorrow, you know, your father will be here, the
following day, for these three days, you know. Because he said he's gonna call
me, and I said: "Don't call me." . . .
I'll call you," I said. So, and that's how we left it off.
Fabio: When does he think?
Francesca: Nothing. He didn't tell me. . . you know, it's not like . . . he just
wanted to know the decision. I said, "Well, the decision is . . . you know, we
have to talk a little bit and see how things are. . ." He said, "Okay, then instead
of going back and forth, you know. . . I'll have Fabio come over here too. . ."

4

Fabio: Yeah.

Francesca: "When we talk we'll have Charlie come over too, and we'll all talk." That's how we left it off. . . .

Fabio: I want you to go talk to him before I go over there, mom. This way. . . I don't understand. I don't understand.

Francesca: I thought you. . . you know.

Fabio: That's what I want. I want yo to go talk to him first. To see how, how, what's in their heads and then if I need to go there I'll go too.

Francesca: All right. I'll call him tomorrow as soon as I am eh . . . and I'll let him know then.

Fabio: Understand?

Francesca: All right. That's what I'll do.

Fabio: Before Sunday.

Francesca: Eh, I know. (Pause) I hope your father will go to the bakery for a little while on Thursday so I can go . . .

"Fabio doesn't want to attend this meeting without knowing what the other attendees think; Fabio would rather attend this meeting once. Fabio wants Francesca to go over there and to talk to them and to report back to him on Sunday and then decide if he should attend this meeting or not."

Fabio: I want you to talk to him. . .

Francesca: All right.

Fabio: About what we discussed today. (Pause) He'll tell you if it's a yes or now, whatever. Right or wrong?

Francesca: Sure.

Fabio: So. If he's gonna say no, when I go there. You know what I'm trying to say? (Pause) What do you think?

Francesca: It would be nice if we all go. If Charlie also comes, and we'll put everything on the table. If they accept it fine, and if they don't they don't. But if you want me to go back again I'll go back again.

Fabio: I'm saying at least they know what we have in mind, do you know what I mean?

Francesca: Yeah.

Fabio: You get to feel. . . You get to feel them, you know, if . . . So I know what they have in mind. Do you know what I'm trying to say? Instead of going over there and have them tell us everything. Then what do we do?

Francesca: If they say no for everything we don't do anything, that's it.

Francesca will try to see Charlie again . . .

Fabio urges his mother to go see a certain person again to try to find out more information.

5

(Exhibit 33)

10/22/97        Fabio's father had his parole decision overturned.  (Exhibit 34)

10/24/97        Francesca tells Fabio that, "I called over there.  And when they beeped me back
                your father walked in.". . ."I couldn't even talked.  I told him it was a lawyer."
                . . . "I told him make an appointment for me by eh. . . Monday or Tuesday (UI)
                I'll try to call (UI) later.
                Francesca says that by the time Mike called her back, her husband walked in."
                Fabio: And what did he say?
                Francesca: Nothing.  You know, I couldn't talk to him.  He said, "How're
                doing?" I said, "I'm okay.  I just . . . you know, I talked to my son Fabio and
                he wants me to make an appointment to come and see the lawyer." You know
                and I cut it short.  What could I say!
                Fabio: What did he say?
                Francesca: He said, you know, "I'm gonna call Jimmy and see if he's available
                Monday or Tuesday." I said, "Okay, I'll talk to you later then, I'll call you back
                and you let me know when the appointment if for."
                (Exhibit 35)

10/28/97        . . . Francesca: Yeah. I sent there.
                Fabio: What happened?
                Francesca: What happened?  We'll talk about it when I'll come over there.
                Fabio: Bad?
                Francesca: Not too bad.
                Fabio: Half and half?
                Francesca: Yeah.
                Francesca asks Fabio around what time she should go over.
                Fabio: Why? What's the difference?
                Francesca: I don't know.  What do you mean, what's the difference?  Do you
                want me to talk in front of Maria. . .
                Fabio: But did you speak to him good?
                Francesca: Yeah.
                Fabio: What did they say about what I told you?
                Francesca: Eh. . . So so.
                Fabio: Why?
                Francesca: It's so so.
                Fabio: Why?
                Francesca: I'll tell you later.
                Fabio: Shit, they think they're so smart!  Not even that?
                Francesca: I'll tell you later.
                Fabio: Eh, not even that?  Hey, mom?
                Francesca: You have to go there on Thursday.

6

Fabio: Oh yeah?
Francesca: Yeah.
Fabio: What should I tell them here?
Francesca: Fabio, we'll talk about it when I come there. Let me call Charlie
too . . . (Exhibit 36)

11/5/97

In a recorded telephone conversation:
Francesca: What did that guy say. . . Vito. . .that his lawyer. . .had a fight with
that guy?
Fabio: What is he gonna say? He woke up now.
Francesca: Who?
Fabio: Vito.
Francesca: What do you mean, he woke up?
Fabio: He's not like before, you know. . .

Francesca asks Fabio if they added the names to the indictment. Fabio says just
one. Francesca said that in the next indictment maybe they will add the other
names.

Fabio: When you go over there, call him. That guy. You know, whatever
happens, happens. If you have to go Monday. . . If. . . tell him to. . . to give
you some subpoena or something.
Francesca: Yeah.
Fabio: Between now and Friday. Otherwise, at the last minute. . . you know,
they'll call me. Understand?
(Exhibit 22)

11/10/97

Fabio calls Francesca and she tells him people are there with a search warrant.
"They're all here this morning. . . . There are many of them. They are taking
pictures and things. So, I don't know how . . . The way they're going about it.
. .Fabio asks if Bruce is there and Francesca says, "They're all here.". . .Fabio
asks Francesca did she call the lawyer. Francesca says she was about to call
him.

Fabio calls back and the search is still going on.

Fabio: What did they say to you?
Francesca: Nothing. Eh. . . "We're searching." They're looking for things . .

Fabio: Did they say anything to you?
Francesca: No, they didn't tell me anything. They just have the search warrant.

Fabio: No, they would've said something.  What did the lawyer say?
Francesca: Nothing.  I have to go there at 5:00. . . .

Fabio: Did they make a show outside?  Everything?
Francesca: There are a lot of them.
Fabio: It's not about Paul, right?
Francesca: No. . . .

"Fabio to Francesca; They are still there.  She can't go see the lawyer.  She's not allowed to go down stairs.  Bruce is in the little room in the garage.  Bruce didn't say anything to Franca yet.  Fabio says that they have been there for a long time.". . .

Fabio calls back at 3:53 p.m. and everyone has left.
Fabio: . . . Ma, what did they say?
Francesca: Eh, tomorrow. . .Did you get a visit?
Fabio: We don't know.  Everything is screwed up because . . . I don't know what time it is.  Because it's a holiday tomorrow.
Francesca: (UI) either I come tomorrow or Thursday and we'll talk, not over

the

phone, it's useless to do (UI) I hope you get a visit tomorrow (UI)
Fabio: All right.
Francesca: Make sure, make sure that Maria is not coming tomorrow when I have to come.  Do me a favor, let her stay home, because I don't know how long it will take.  It could take a half hour, an hour, two, three. . . I don't know.  For me . . . I think we should spend one visit alone.  We have too many things to discuss.  If it's possible.  See what they will tell you today.  I'm going to see the lawyer now.  You can call around 5:30 its likely that I will be there. . . .
Fabio: Did Bruce say anything?
Francesca: We talked a little bit.
Fabio: Oh.

Fabio calls back later.  The visit tomorrow is at 12:30. . . . She went to see the lawyer today.  They'll see each other tomorrow.
(Exhibit 37)

11/14/97          Fabio: This guy, Vito's lawyer has a hard head.  Forget about it!
Francesca: I know.
Fabio: That's the problem too.  Because he's half convinced.
Francesca: What?
Fabio: He is half. . .
Francesca: Half convinced.
Fabio: . . .convinced.

8

Francesca: I know Eddie (PH) was telling me already, "I'm trying to convince him."

Fabio: Is half. . . we had him convinced last night; not just half convinced! But as soon as his lawyer shows up. . . Shit, he's like eh . . . I don't know. He puts things in his head.

Francesca: Maybe he tells him that they don't have anything.

Fabio: No, he tells him, "Forget about it. Get it out of your head, please." He tells him, this and that, and you know, things like that.

Francesca: Sure, because he wants to go to trial so he can get money.

Fabio: Shit, he's incredible, this guy.

Francesca: He came in today?

Fabio: Yeah. I noticed the difference already. As soon as he came up, forget about it! You know?

Francesca: Yeah.

Fabio: Yeah, this lawyer is ruining him, (UI). Because he. . .you know. . .he's starting to understand.

Francesca: Sure, he starts to understand.

Fabio: But as soon as this guy shows up, he plants things in his head. "You can hire an investigator, this and that. . ." and they don't do shit.

Francesca: Yeah, sure.

Fabio: That guy is on trial, tomorrow.

Francesca: Who?

Fabio: His lawyer. He wants (UI) to go there to see him.

Francesca: Oh yeah. He's going to give this guy a hard time too.

Fabio: What?

Francesca: He's going to give him a hard time too.

Fabio: How?

Francesca: Well. . .

Fabio: To the lawyer?

Francesca: Eh sure.

Fabio: Yeah?

Francesca: Didn't you hear the judge? (UI) friends.

Fabio: Eh sure. That's what he said, right.

Francesca: Didn't you hear him?

Fabio: Yeah.

Francesca: Vito's lawyer said, "I call him Jim because we are on first names terms." The judge replied, "Not after today."

Fabio: Right. Sure, after all those things that he said.

Francesca: "Not after today you're going to be on first name terms." So. . .

Fabio: This guy has a personal thing with this guy Jim. You know? I don't know what's up with him. Like he wants to show that he's bad. I don't know what he has in mind this guy (UI).

9

Francesca: Yes but, he also has to think about other people's lives.
Fabio: Unbelievable.
Francesca: Yeah, that's why. . . he's very bad. . .these lawyers. . .he gets into everything.
Fabio: Yeah, he's a little thing and he gets into everything.
Francesca: Yeah, he's in everything. I know. Hector (ph) told me too.
Fabio: Yeah?
Francesca: Yeah, because he knows him.
Fabio: They're in the same office. Yeah, he's bad, ma. He's bad. He does everything. . .
Fabio: I don't know why. He's gonna . . .This guy is gonna end up going to trial and get life, this kid.
Francesca: Yeah I know. . . .

Fabio: Yeah! Stupid! But he, you know, if it was up to him. . .he's convinced, he knows that there are problems. You know?
Francesca. Yeah. . .

Francesca: The lawyer doesn't know.
Fabio: He doesn't know.
Francesca: That's what you guys have to tell him. Say, "the lawyer doesn't know everything. You know everything."
Fabio: Yeah.
Francesca: Say, "Hey, there's life! It's not the lawyer's . . .life." He . . .once you go in for life, he's still gonna have his life. . . .

Francesca: This is what you guys have to make him understand.
Fabio: He understands this, but as soon as this lawyer shows up. . .
Francesca: Well, at the end, it's his decision that counts and not the lawyers.
Fabio: We have to see, Monday there's a call for him.
Francesca: Oh yeah.
Fabio: Do you see, there's a problem there already"
Francesca: Wh. . . oh, I know.
Fabio: If I couldn't go. I had to go there like . . .
Francesca: No. No, you have to go.
Fabio: I'm saying.
Francesca: Sure. Sure, from there then you can begin. . .
Fabio: Sure. The lawyer is one thing. They'll call me anyway.
Francesca: Eh, you are there and you are not going to go!
Fabio: Eh!
Francesca: Let's see Sunday when he calls me. . .(UI) when we have to go.
Fabio: It would be good if you went before Wednesday.
Francesca: Probably I'm gonna go either Monday or Tuesday.

10

Fabio: Yeah.  All right.  So I'll call back in a little while.
(Exhibit 38)

11/15/97

Fabio: They took what's his name out of here.  I forgot to tell you.
Francesca: Who?
Fabio: Vito.
Francesca: Vito?
Fabio: Vito, Vito.
Francesca: Yeah! When?
Fabio: Yeah, yesterday.
Francesca: What are you saying?
Fabio: Eh.
Francesca: Did they (UI) the visit?
Fabio: No.
Francesca: (UI) the visit?
Fabio: No, the next day.  Thursday.  This week it was Friday.
Francesca: Oh, so he's not there anymore.
Fabio: No.  He got blamed for that guy in the wheel chair.  Can you imagine?
I swear to Got!
Francesca: Oh!
Fabio: They fixed him up.  I can't believe it.  Can you imagine. . . how bad it
is in here?
Francesca: (UI) inside there it's worse than outside.
Fabio: It's bad.  It's bad.  Unbelievable!  He's blaming him too.
Francesca: The guy in the wheelchair?
Fabio: Yeah.
Francesca: You're kidding.
Fabio: I guess so.  I can't see them. . . doing this thing without this guy saying
something.  You know what I'm saying?
Francesca: Eh, sure.
Fabio: He's gotta be saying something to them.  I can't believe the way they
just set people up like that.  Amazing.
Francesca: And now. . .
Fabio: Forget about it!  They're going to torture this guy now.  They'll probably
get him out of the building and everything, probably, who knows where he's
going to end up.
Francesca: Did they put him in the hole?
Fabio: Yeah.  He's in the hold right now. . . (Exhibit 39)

11/17/97

Fabio asks her if she spoke to the lawyer.
Francesca: Yeah, you didn't have the co-defendant meeting?
Fabio: I was supposed to have it now, but nobody called me yet.
Francesca: Well, that's what the lawyer said.

11

Fabio calls Francesca back at 4:47 p.m.

Francesca: So what happened?  All the lawyers there?

Fabio: Yeah.

Francesca: Yeah.  He came out too?

Fabio: Who, Vito?  Yeah.

Francesca: Oh, all right. (UI)

Fabio: No, they were supposed to take him today. . . I don't know where.  But he's going to leave tomorrow.

Francesca: Oh, they're transferring him?

Fabio: Yeah.

Francesca: What did the lawyer say?

Fabio: "(UI) everything is all right.  Don't worry about it.  It's nothing." . . .

Francesca: Did he see yesterday's newspaper?

Fabio: Yeah.

Francesca: And what did he say"

Fabio: What can he say?  He knows that there are problems.  The lawyer. . .you know. . .

Francesca: (UI) the lawyers.  And now they are taking him away.

Fabio: Yeah.  I know.  He told him. . .He called you yesterday.  And you were not home.

Francesca: Oh, yeah!

Fabio: Yeah, he's gonna call when he gets where he has to get.  Le you know where he is and stuff.

Francesca: Maybe they'll take him to (UI).

Fabio: No, MCC.

Francesca: Oh yeah!  You think so.

Fabio:  Who knows, ma?  Anyway, the lawyer is probably going to call you tomorrow.

Francesca: Yeah, and what did he say?

Fabio: Nothing.  He doesn't know if for Wednesday. . .(UI) you know, he doesn't know if he can do it.

Francesca: What?

Fabio: He don't know if what's his name could do it Wednesday. . . .
(Exhibit 40)

11/21/97     Vito didn't call Francesca yet.  Fabio believes he was taken to the MCC.
             (Exhibit 23)

2/4/98       The Court, "In Mr. Walden's letter he stated that there should be a superseding indictment during the week of February 15[th] and there is going to be a death penalty offense against, at least, one of these defendants; is that correct?"

12

(Tr.p.6[7])

Walden, ". . .and I suspect when a new superseding indictment is filed that contains a fair number of a additional crimes against certainly defendants and a death penalty offense or death penalty offenses against one or more of the defendants, Your Honor is going to see a new round of severance briefs or. . ." (Tr.p.16)

2/18/98        The Court, "Now if you file your superseding indictment - - and I understand from your letter it is going to be a possibility of one or more defendants with the death penalty. (Tr.p.6)

Rubinstein, ". . .if in fact Vito Guzzo is the person that they suggest they are going to seek the death penalty against, . . ." (Tr.p.10)

Walden, ". . .I put a copy of that letter in the court's file, indicating that if and when any defendant in this case is charged with the death penalty, they be afforded every right that they have under Dept. of Justice regulations. (Tr.p.11)

2/26/98        The Court, "These are death penalty --"(Tr.p.5)

Walden, "The death penalty protocol requires that the government go through a fairly extensive process, as the court is aware, as to determine whether or not there will be a death penalty determination. (Tr.p.10)

Walden, "The only thing I'm trying to avoid, Judge, there's a considerable amount of litigation going on in the next sixty days in terms of photographic hearing, the death penalty, et cetera. (Tr.p.13)

The Court, "Now, there are death penalty counts against three of the defendants, and you are going through a process where a decision is going to be made by the U.S. Attorney, . . . whether there's going to be a death penalty request in this case; is that correct? (Tr.p.16)

The Court, "This is not at death penalty case. When it becomes a death penalty case, we'll address that. (Tr.p.21)

Rubinstein, ". . . we are entitled to have the benefit of a death penalty consultant. . . . in this area of law as experts in the death penalty phase." (Tr.p.21)

---

[7]Cites to Transcript pages for hearings on the date listed.

The Court, "Until this becomes a death penalty case, I will not appoint anybody." (Tr.p.21)

Rubinstein, "I understand Your Honor has the power to set a date within which either the government has to file this notice of intent to seek the death penalty, or in fact they are barred from seeking the death penalty. (Tr.p.22)

Rubinstein, "If they don't have enough information now to seek the death penalty, I wonder what the next four months will provide to them, Judge." (Tr.p.23)

The Court, ". . . I will designate this as a complex case, particularly with respect to it might be a death penalty with respect to some of the defendants." (Tr.p.36)

Rubinstein, "I object to the death penalty." (Tr.p.36)

5/6/98      Walden, "Mr. Ragusa is not currently charged with death eligible offense." (Tr.p.4)

5/20/98     Walden, "Therefore, because it's a death qualified case, Judge, I think it's an issue that the court must reflect upon." (Tr.p.13)

The Court, "Mr. Solotaroff was appointed as a death penalty specialist because some of the counts against you in this indictment require death penalty, assuming it is approved by the Attorney General." (Tr.p.14)

The Court, "As a death penalty counsel, he will be assistant Mr. Rubinstein, who as I understand it, is your lead counsel. (Tr.p.14)

The Court, "This is a death penalty case, and out of abundance of caution, I would like to touch all bases when I see or feel the bases need to be touched." (Tr.p.18)

6/16/98     Walden, "Judge, we had set up a schedule where the government was going to file its notice of intent to seek the death penalty on June 26." (Tr.p.17)

Walden, "I'm sure, Your Honor, you saw the flurry of correspondence between us and the defense lawyers indicating that our internal committee was extremely interested in granting their request to submit materials in mitigation of the death penalty before making a recommendation. (Tr.p.17)

Walden, "Thus, under the - - at the request of the policy section in Washington,

14

I am going to ask the Court to allow the government to delay its notice until
July 29, and I believe the defendants are going to consent to that delay, . . .
(Tr.p.18)

Solotaroff, "However, depending on what the result of all this is I do reserve
the right to seek an adjournment of the trial date depending on when we
actually get the death notice." (Tr.p.18)

6/17/98

Durso arrested for a 1996 murder before his scheduled third scheduled meeting
with Mark Feldman (head of the Brooklyn U.S. Attorney's Organized Crime
Unit) and Paul Weinstein. (Gangland News article, 2/21/02, Exhibit 41)

Walden and Durso signed cooperation agreement for the beginning of 3 year
undercover investigation. (Exhibit 18)

DeRoss Trial Transcript Excerpt:
While being questioned by lawyer Paul LeMole about
the time of day Durso agreed to cooperate on June 17, 1998:
LeMole, "Did you make it (your decision to cooperate) at the office of the FBI
on the date of your arrest.
Durso, "I don't know where they housed me. I don't know the facility.
When LeMole followed with "Sir, will you answer the question," Judge Reena
Raggi interrupted and admonished him. "He's answered the question," Judge
Reena Raggi interrupted and admonished him. "He's answered the question.
I want you to be carful about doing that Mr. LeMole."
When LeMole protested Durso hadn't, Raggi said he had, and told LeMole to
ask anther question.
LeMole, "Sir, did you decide to cooperate while you were in the FBI's office?"
Raggi called the lawyer to the bench for a sidebar and said, "He has tried to
answer that question repeatedly."
LeMole Replied that Durso had said "afternoon" and he was trying to establish
"how long he was at the FBI office."
LeMole, "Sir, can you tell us the time of day you decided to cooperate?"
Durso, "It was probably 4:00, 5:00 o'clock." (Exhibit 19)

6/18/98

9:25 a.m. telephone call from Durso to Vito's cousin Maria. Maria discusses
a deal for Vito's life that calls for $100,000 from Vito. Maria needs help
getting $20,000 by the end of the week and she needs another $50,000 by July
17th. The money is to be given to Vito's lawyer.[8] (Exhibit 1, 12)

---

[8]Vito would testify that Fabio told Vito that his mother knew a lawyer who was friends with
Zachary Carter by the name of Gavin Scotti. Francesca Bartolotta said Scotti can get Vito a 20 year

15

6/18/98       Durso telephoned Ron Rubinstein's office at 10:11 and left voice message for Ron to page him. Durso also said that Vito instructed him to call Rubinstein regarding Anthony [Christopher] cooperating and that maybe he could shed some light. (FBI 302, Exhibit 10)[9]

Ron Rubinstein wrote a letter to Judge Johnson asking to be released from Guzzo's case.

Durso plead guilty to murder. (Exhibit 19)

Fabio Bartolotta and his attorney, Ephraim Savitt, Esq. met with FBI Special Agents Michael Breslin, Rick Demberger, Pat Luzio, and Mary Beth Paglino and Lauren Resnick and Jim Walden of the U.S. Attorney's Office. At that meeting he signed a proffer agreement. (Exhibit 2)

6/18/98       According to Pertinent Call Verbatim, 183E-NY-255024, at 9:25 Michael Durso telephoned Vito's cousin, Maria Necci, and then she called him back.

---

plea and also get a great plea for Fabio and Joe Scuilara. Also possibly Paulie Ragusa also. Vito sent Mike Marciano to speak to Francesca about this at her house on 4 or 5 occasions. Francesca told Marciano that Scotti wanted $400,000 to make the deal for them but they only had until July 17, 1998 to pay the money or the deal would be off. Francesca said they had to each come up with $100,000 but Vito was the one that had to hire him. Marciano told Vito that on a visit Francesca was on the telephone speaking to Carter about hiring Scotti. Vito did not trust Francesca but told Marciano his life was on the line because of the death penalty and to have Scotti give him a legal visit. Vito met with Gavin Scotti and Ron Rubinstein on a legal visit when Mr. Scotti told Rubinstein and Vito that he knew nothing about a 20 year plea or about the $400,000. Subsequently, Vito relayed this information to Fabio Bartolotta, when they met in the bullpen on the way to court. Fabio's response was that they must hire Mr. Scotti and everything would be taken care of. On a later visit with his cousin, Maria Necci, Vito told her Mr. Scotti knew nothing about the deal but that Fabio said to hire him. Maria confirmed that Francesca told her that Mr. Scotti must be the lawyer for the deal to work, but that the money was going to a different lawyer behind the scenes. Maria told Vito that Francesca wanted the money given to her to pay the lawyer, but Francesca declined to name that lawyer. (See Maria Necci Necci affidavit, Exhibit 24.)

Vito's cousin Maria thought that if Vito didn't hire Gavin Scotti through Francesca Bartolotta that Vito was going to get the death penalty. From the taped conversation between Francesca and Durso the government knew that Maria was trying to get the money for Mr. Scotti. And that Vito would accept a plea. Francesca also spoke to Ron Rubinstein about the case and hiring Mr. Scotti. By using Durso and the Bartolotta's the government knew what was happening in Vito's defense and that he would accept a plea and because of this they kept mentioning the death penalty. (Exhibit 12)

[9]Vito would testify that he never discussed Anthony Christopher cooperating with Durso.

16

Maria tells Durso that he will not be arrested, that his name is on as an unindicted co-defendant and she asks him for money for Vito. Maria tells Durso they took away Vito's 30-year plea and they're giving him a choice of two things, life without parole or the death penalty. Maria tells him that Fabio's mother is trying to put together a deal for $100,000 from each defendant. Maria said that she saw Vito yesterday and he needs guys to help him get the money together before the deal is over on July 17th. Maria also tells Durso that Vito said if these people can get him a 30-year plea that he will take it. Maria also tells Durso to talk to Ron to find out that he is not going to get into trouble. (Exhibit 12)

According to Pertinent Call Verbatim, 183E-NY-255025, Michael Durso telephoned Ron Rubinstein's office at 10:11. Mr. Rubinstein was not available so Durso left a voice message for Rubinstein to page him. (Exhibit 10)

6/24/98

According to a Bodywire tape at 8:36 a.m., Durso met with Guzzo's lawyer, Rubinstein and recorded the conversation. The meeting took place in the streets. Durso said that Rubinstein demanded money for one of his clients who said Durso would give it. (Exhibit 11) Government agents knew of Durso's meeting with Rubinstein and wanted to record it. (Exhibit 9)

Durso's trial testimony and tape recording also stated that he went to Alan Futerfas' office but he did not recall it being recorded. (Exhibit 8, 9)

Tr. Date 1/22/02

DeRoss Trial, Durso Testimony, Tr.p. 652, Durso, "What happened was, at this time, I was cooperating with the government and I had went to go borrow 20,000 from Billy Cutolo for a Colombo Family associate named Vito Guzzo, and I took responsibility for the money, and I did it with the government's supervision. (Exhibit 9)

DeRoss Trial, Durso Testimony, Tr.p.1594, Exhibit 9:
Durso, ". . ., I gave this - - girl who was Phil Sciarrata's sister money for Vito's attorneys, [] gave an investigator by the name of Les three thousand. And I also had borrowed twenty thousand from a captain in the Colombo Family, his name was Bill Cutolo, and I gave it to Vito's brother to use it - - utilize it for capital punishment attorney that he had.
Walden, "Did there come a time that you ever met directly with Guzzo - - attorney at the time?"
Durso, "Yes."
Walden, "Who was that?"
Durso, "Ron Rubinstein"
Walden, "Did Rubinstein give you any significant information about Guzzo's case?"

17

Durso, "He - - educated me on what was going on in the case. He said to me that he believed that Anthony Christopher was bad. (Exhibit 9)

6/19/98    Maria has conversation with Durso and discussed the status of Vito's case. (Exhibit 1)

6/25/98    According to FBI 302, Durso met with Alan Futerfas with regard to the matter concerning Anthony and Vito Guzzo. The purpose for this meeting was to diffuse any scrutiny placed on the source as a result of his meeting with Vito Guzzo's attorney." Guzzo's attorney is requesting money and works with Futerfas. At the meeting Futerfas advised Durso not to provide money for Vito's attorney expenses. (Exhibit 8)

6/29/98    Fabio Bartolotta and his attorney, Ephraim Savitt, Esq. met with NYPD Detective Thomas Marsigliano, Special Agents Mary Beth Paglino, Rick Demberger, Michael Breslin, and Pat Luzio of the FBI, Special Agent Steve Grogan of the Office of Inspector General and John Kroger, Seth Marvin and Jim Walden of the U.S. Attorney's office. Fabio signed a proffer agreement at this meeting. (Exhibit 4)

7/2/98    Rubinstein, "What I think if in fact it appears that this will be a death penalty case, that all the attorneys should be in place so the lawyers could be up to speed. (Tr.p.3)

Solotaroff, ". . . but just when you originally appointed me as death penalty counsel, you also appointed two other individuals who are far more experienced than I was, at least one of them was far more experienced than I was in death penalty cases, I think. . ." (Tr.p.3)

Solotaroff, ". . . that we would all work together and we would all help each other, and that my lack of relative experience in the federal death penalty area would be supplemented by my co-counsel." (Tr.p.4)

Solotaroff, ". . . that the Court appoint, consult with the Federal Death Penalty Resource Center, and appoint someone who has actually done a federal death penalty case before, because I really - - I think there is a very high chance that that's where we are going here. (Tr.p.4)

Solotaroff, ". . . then the Court could appoint someone, a strictly death penalty counsel." (Tr.p.4)

The Court, ". . . this will or is a death penalty case at this particular point or had been recommended, but Washington has not ruled on it." (Tr.p.5)

18

Walden, "There hasn't been a recommendation at any stage actually that Mr. Guzzo received the death penalty." (Tr.p.5)

The Court, "But there is a potential death penalty with respect to this defendant." (Tr.p.5)

Rubinstein, ". . .the defendant is less than happy with the fact when Mr. Walden, prior to superseding on the death penalty count had said that if we consented to an adjournment so that they can discuss pleas with all defendants, that I opposed, I wouldn't consent, and then the superseders came with the death penalty count, and he feels that had I consented, that the superseder wouldn't have come forward with the death penalty count." (Tr.p.6)

Walden, "When we were last here, Judge, on the 16th of June, I made an application to the Court which was granted, and that application was that the death penalty protocol process is obviously something that the office takes very seriously and devotes a considerable amount of resources to considering every possible fact, . . ." (Tr.p.7)

Walden, "The schedule set by your Honor is that a notice of intent to file a death penalty motion must be made on June 29. *I would ask that your Honor allow the government to file that motion the end of August.*" (Tr.p.8)

Solotaroff, "The idea that we have to try the case six weeks after there is a death penalty notice is frightening, to put it honestly. There are extra motions that have to be filed once the case is a death penalty case that haven't been filed now. . ." (Tr.p.9)

| | |
|---|---|
| 7/6/98 | According to an FBI 302 Durso telephoned Vito's cousin Maria twice but he was not able to reach her. (Exhibit 7) |
| 7/7/98 | According to an FBI 302 Durso telephoned Vito's cousin Maria at 9:06 a.m. to ask if anyone went to see Billy Cutolo. Maria does not know how to get in touch with him. Durso asks her to ask his friend, Vito, since that's the guy the source told Anthony Guzzo he was going to see. Maria is sure no one went to see him. Durso would be embarrassed if someone already went to see Cutolo. The 302 says: This call is in reference to obtaining money from Cutolo for Vito Guzzo's defense. (Exhibit 16) |
| 7/13/98 | Fabio Bartolotta interviewed by Special Agent Stephen T. Grogan, and U.S. Attorney's Seth Marvin and John Kroger. Also present were FBI agents and at times AUSA Jim Walden. The interview report states that Bartolotta is presently cooperating with the FBI regarding organized crime matters. (Exhibit |

19

20)

7/21/98

According to FBI 302 telephonical [sic] investigation on 7/6/98, Durso agreed to record his telephone conversation with Maria (Vito's cousin) at her office - he was unable to reach her. (Exhibit 20)

7/29/98

According to FBI 302 transcribed 7/29/98 Durso met with several people at Bully Cutulo's social club on 63rd Street. There came a time during the meeting that Frank Campi stepped outside with Durso. Campi advised Durso that Cutulo wanted to know if Vito Guzzo was going to take the 30 year plea. (Exhibit 15)

Guzzo wrote to Judge Johnson asking for Rubinstein's release from his case. Judge Johnson released Rubinstein from Vito's case. On that same day Guzzo says Rubinstein, Scotti and Solotaroff met with the death penalty committee and Mark Feldman was present. This meeting was post Durso wire. [10]

Walden, "To give the Court some background, the office is obviously in the process of deciding whether or not to authorize or recommend, rather, to the Attorney General that Mr. Guzzo be death penalty eligible." (Tr.p.2)

Walden, ". . . but was only retained for the limited purpose of trying to negotiate a disposition prior to the Attorney General's recommendation either way on death penalty - - her decision, rather, on the death penalty." (Tr.p.3)

Walden, "Number one, I believe that Mr. Solotaroff is going to ask to be relieved as death eligible counsel and to appoint as Mr. Rubinstein's primary trial attorney - -" (Tr.p.3)

Walden, "He is then going to ask death eligible counsel be appointed for Mr. Guzzo and my understanding is he's going to ask for several reasons to adjourn the trial date." (Tr.p.3)
The Court, "Anybody facing the death penalty should be concerned." (Tr.p.9)

Scotti, ". . . arrive at a disposition of the case so that, frankly, we wouldn't have to get into the issue as to whether or not there was going to be death penalty request in the case." (Tr.p.9)

The Court, "Yes, but you are retained by the government for death penalties,

---

[10]Guzzo would testify that Rubinstein met with Mark Feldman and other prosecutors to try to get him a plea deal. He does not know if this was before or after the Durso wire in June 1998.

which is required by the statute." (Tr.p.11)

The Court, ". . . even if Mr. Carter should say that he is not going to seek the death penalty it does not end there. It still goes down to Washington and a death penalty could be authorized by the Attorney General." (Tr.p.14)

The Court, "This involves an issue of whether the defendant is going to be put to death if he is convicted." (Tr.p.14)

According to FBI 302 Frank Campi advised Durso that Billy Cutolo wanted to know if Vito Guzzo was going to take the thirty-year plea with regard to Guzzo's Pending Case. (Exhibit 14)

7/30/98

Guzzo, "Yes, and have another death penalty lawyer." (Tr.p.5)

The Court, "Okay, you are relieved and you are appointed as representative for Mr. Guzzo and I will appoint a death penalty counsel for Mr. Guzzo." (Tr.p.5)

Solotaroff, "As the Court will recall, the decision on whether to seek the death penalty in this case has been delayed several times and each time the government asked for an extension and our position - -" (Tr.p.6)

Solotaroff, "Judge, the application is to adjourn both the time for the government to seek the superseding indictment, the time for the death penalty decision to be made and the time for the trial." (Tr.p.6)

The Court, "You're asking me to delay either Mr. Carter or the Attorney General to make a decision with respect to whether they're going to seek the death penalty? (Tr.p.6)

Walden, "Your Honor has imposed a date on which we're supposed to file our notice of intent to seek the death penalty and that date was something that Your Honor established in part because Mr. Rubinstein at the initial status conference was very adamant that there be a firm date set and we agreed that some date should be set." (Tr.p.7)

Walden, "I think that Mr. Solotaroff is mindful of the fact that he would rather dispose of it earlier rather than later, at the earliest stage of both this proceeding as early as possible now that he's in the case as lead lawyer and, secondly, as early in the death penalty protocol process as possible." (Tr.p.7)

Solotaroff, "Judge, I think that by the end of September for the death penalty decision and for the government to supersede and then a trial date towards the

21

end of the year I think would be appropriate." (Tr.p.8)

Solotaroff, "Let me just say why I think the trial date needs to be adjourned; as I've always said, this is how I started out my application, if the government decides to seek the death penalty, I don't think - - I don't see how we can be ready in October because there is a whole round of litigation that has to be made against the death penalty, against the constitutionality and against the federal statute." (Tr.p.8)

Solotaroff, "It is a death penalty case and I want to make sure I'll be prepared." (Tr.p.9)

The Court, "Now, the superseding indictment with the death penalty and whatever else you're going to add or delete will have been handed down by then?" (Tr.p.11)

Walden, "We ask for the notice of intent to seek the death penalty by October 16 and the return of the superseding indictment by October 2, that way we'll have a bit of a stagger between the two." (Tr.p.11)

Walden, "I anticipated, Your Honor, that if the indictment came down on the 2nd that we could have the arraignment and the filing of the notice of the intent to seek the death penalty both on the 16th." (Tr.p.11)

Walden, "But internally the process is at such an advanced stage and I've consulted with Washington, they've indicated that they will turn the decision around within a 30-day period." (Tr.p.12)

8/11/98        Fabio Bartolotta signed a cooperation agreement with AUSA Jim Walden. (Exhibit 3)

8/18/98        According to FBI 302 Durso was equipped with a recording device for the purpose of recording his telephone conversation with Anthony Guzzo. The conversation arranged a meeting between Durso and Anthony Guzzo for the morning of 8/18/98 in the parking lot area of Mimo's restaurant. (Exhibit 5)

8/19/98        According to FBI 302 Durso met with Anthony Guzzo at the parking lot area of Mimo's restaurant. The purpose of the meeting was to provide Anthony with a controlled payment of $20,000, which was done. Anthony tells Durso that Gary [Gavin] Scotti is Vito Guzzo's new attorney. (Exhibit 6)

9/1/98         According to FBI 302, Anthony Guzzo advised Durso that Vito Guzzo would agree to take a guilty plea that would require him to spend thirty years in

22

prison. (Exhibit 14)

| | |
|---|---|
| 9/11/98 | According to FBI 302 at 9:41 a.m. Durso telephoned Vito's attorney Jason Solotaroff and left a message with the secretary with his name and pager number. (Exhibit 13) |
| 9/14/98 | According to FBI 302 at 8:26 a.m. Durso telephoned Anthony Guzzo and was unable to reach him but did leave a message. (Exhibit 13) |
| | According to FBI 302 at 12:11 p.m. Durso telephoned Jason Solotaroff and left his name and beeper number with the secretary because Mr. Solotaroff was not available. (Exhibit 13) |
| 10/26/98 | Guzzo wrote to Jason Solotaroff regarding issues for an appeal. (Exhibit 17) |
| 10/28/98 | Guzzo would testify that he telephoned Solotaroff and Scotti between 3:00-3:30 p.m. to request appeal.  Jason told him not to speak so as not to make Walden mad.  Scotti told Vito that he had pled guilty and was sentenced so who would he want to appeal. |
| 11/16/98 | During a legal visit at the M.C.C., Guzzo would testify that he spoke about guidelines with Solotaroff and told him he was sentenced above his guidelines. Solotaroff said that even if he was sentenced to the correct guidelines that Judge Johnson can upward depart his sentence to life.  Solotaroff told Guzzo to leave it alone. |
| Tr. Date 1/22/02 | Durso testified at the DeRoss trial that Rubinstein made disclosure about a cooperator (Anthony Christopher) while discussing Vito's case. (Exhibit 9) |
| 10/18/00 | According to FBI 302 during a meeting Guzzo's attorney fees were discussed, "CUTOLO provided the source with $20,000 for Guzzo's attorney fees. The money went to the attorneys RON RUBINSTEIN and JOE COROZZO." (Exhibit 6) |
| 12/21/00 | Fabio admitted that he is a liar, had his plea agreement ripped up, pleaded guilty to perjury.  (Capesi Gangland news article, Exhibit 19). |
| 6/3/02 | Gavin Scotti told court that a lawyer named Larry Herman was the one who recommended him to Guzzo.  Larry Herman is Francesca Bartolotta's lawyer. Vito would testify he never spoke to Herman about hiring Scotti, all this came from Francesca. (6/3/02 hearing tr.) |